UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | | |
|---|---|---|
| WILLIAM FROST, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 6:17-cv-01449-HNJ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND DISMISSAL ORDER

Plaintiff William Frost seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Secretary"), regarding his claim for Supplemental Security Income. The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for disability benefits and establish entitlement for a period of disability, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define "disabled" as the

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

"inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520. The burden rests upon the claimant on the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. *Id.* at § 404.1520(d). If a

claimant's impairment meets the applicable criteria at this step, that claimant's impairments would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii). That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant is successful at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing

other work. 20 C.F.R. §§ 404.1512(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Applying the five-step sequential process, the ALJ found at step one that Frost had not engaged in substantial gainful activity from his alleged onset date of October 14, 2014[2], through the date of the ALJ's opinion, August 9, 2016. (Tr. 12). At step two, the ALJ found that Frost suffers the following severe impairments: scoliosis; lumbar facet arthropathy; gastroesophageal reflux disease (GERD), post-surgery; and hiatal hernia, post-surgery. *Id.* At step three, the ALJ concluded that Frost's impairment or combination of impairments did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13).

Next, the ALJ found that Frost exhibited the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) but with certain limitations.[3] (Tr. 14). At step four, the ALJ found that Frost could perform his past relevant work as a security guard. (Tr. 16).

---

[2] At the hearing, Frost amended his alleged onset date to October 14, 2014. (Tr. 44).

[3] The ALJ described the following limitations:

> [The claimant] can frequently reach overhead bilaterally; frequently climb ramps and stairs but never climb ladders or scaffolds; and he can frequently stoop but can only occasionally crouch, kneel and crawl. Furthermore, the claimant should never be exposed to unprotected heights, dangerous machinery, dangerous tools, or hazardous processes. The claimant should never operate commercial motor vehicles. In addition to normal workday breaks, he would be off-task 5% of an 8-hour workday (non-consecutive minutes).

(Tr. 14).

On June 21, 2017, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 2). On August 25, 2017, Frost filed his complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Frost contends substantial evidence does not support the ALJ's decision. Specifically, he faults the ALJ for: (1) improperly finding that Frost could perform his past relevant work as a security guard; (2) failing to utilize the Medical-Vocational Guidelines to show a finding of disability; and (3) improperly according partial weight to the opinion of the treating physician. After consideration of the record and the ALJ's decision, the court finds substantial evidence supports the ALJ's determination.

### A. Substantial Evidence Supports the ALJ's Finding that Frost Could Perform His Past Relevant Work

At step four, the ALJ must determine whether the claimant is capable of performing his past relevant work. *See* 20 C.F.R. § 404.1520(e). The review at this step involves the assessment of a claimant's residual functional capacity and requires consideration of the physical and mental demands of his former work. *Id.* To determine the physical and mental demands of a claimant's past work, an ALJ may rely on the testimony of a vocational expert ("VE") and the job descriptions set forth in the Dictionary of Occupational Titles ("DOT"). *See Simpson v. Comm'r of Soc. Sec.*, 379 F. App'x 948, 952-53 (11th Cir. 2010).

In this regard, "the ALJ has the duty to *fully* investigate and make *explicit* findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant h[im]self is capable of doing before [the ALJ] determines that [ ]he is able to perform h[is] past relevant work." *Nelms v. Bowen*, 803 F.2d 1164 (11th Cir. 1986). However, at this step, the burden still falls upon the claimant to prove that he cannot do this past work either as performed *or* as it is generally performed in the national economy. *Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir. 1990)(citing *Cannon v. Bowen*, 858 F.2d 1541, 1544 (11th Cir. 1988)).

Frost alleges the ALJ improperly found that he could return to his past relevant work as a security guard because the DOT classifies the job as light work yet the vocational expert ("VE") testified that Frost performed the job at a sedentary level. The Commissioner responded that the ALJ adequately considered the testimony of both Frost and the VE, and therefore substantial evidence supports the ALJ's determination that Frost could perform his past relevant work.

The ALJ relied on testimony from the VE concerning Frost's past work experience. (Tr. 73-77). The VE confirmed Frost performed his past relevant work as a security guard at the sedentary level. (Tr. 74). Furthermore, the VE identified the position in the DOT at § 372.667- 034. (Tr. 73). *See* 1991 WL 673100.[4] The VE

---

[4] The DOT defined the position as follows:

further testified that a hypothetical individual with Frost's RFC could perform his past relevant work as he actually performed it and as generally performed in the national economy. (Tr. 75-76).

The court finds that substantial evidence supports the ALJ's determination that Frost could still perform his past relevant work as a security guard. Frost contends the ALJ erroneously listed his security guard experience as past relevant work because he

---

Guards industrial or commercial property against fire, theft, vandalism, and illegal entry, performing any combination of following duties: Patrols, periodically, buildings and grounds of industrial plant or commercial establishment, docks, logging camp area, or work site. Examines doors, windows, and gates to determine that they are secure. Warns violators of rule infractions, such as loitering, smoking, or carrying forbidden articles, and apprehends or expels miscreants. Inspects equipment and machinery to ascertain if tampering has occurred. Watches for and reports irregularities, such as fire hazards, leaking water pipes, and security doors left unlocked. Observes departing personnel to guard against theft of company property. Sounds alarm or calls police or fire department by telephone in case of fire or presence of unauthorized persons. Permits authorized persons to enter property. May register at watch stations to record time of inspection trips. May record data, such as property damage, unusual occurrences, and malfunctioning of machinery or equipment, for use of supervisory staff. May perform janitorial duties and set thermostatic controls to maintain specified temperature in buildings or cold storage rooms. May tend furnace or boiler. May be deputized to arrest trespassers. May regulate vehicle and pedestrian traffic at plant entrance to maintain orderly flow. May patrol site with guard dog on leash. May watch for fires and be designated Fire Patroller (logging). May be designated according to shift worked as Day Guard (any industry); area guarded as Dock Guard (any industry); Warehouse Guard (any industry); or property guarded as Powder Guard (construction). May be designated according to establishment guarded as Grounds Guard, Arboretum (any industry); Guard, Museum (museums); Watchguard, Racetrack (amuse. & rec.); or duty station as Coin-Vault Guard (any industry). May be designated Guard, Convoy (any industry) when accompanying or leading truck convoy carrying valuable shipments. May be designated: Armed Guard (r.r. trans.); Camp Guard (any industry); Deck Guard (fishing & hunt.; water trans.); Night Guard (any industry); Park Guard (amuse. & rec.).

1991 WL 673100.

never performed all of the tasks listed in the DOT's description. (Doc. 12 at 10). However, it remains the claimant's burden to demonstrate he can no longer perform his past relevant work as he actually performed it, and he can no longer perform the work as performed in the general economy. *Waldrop v. Comm'r of Soc. Sec.*, 379 F. App'x 948, 953 (11th Cir. 2010). Frost provides no evidence to counter the ALJ's finding in both regards.

The record demonstrates the ALJ adequately considered evidence of the duties Frost performed as a security guard, emphasizing Frost's testimony that he performed his job at a sedentary level. (Tr. 73). The VE testified her assessment regarding Frost's past relevant work was consistent with the information set forth in the DOT. In his opinion, the ALJ determined Frost's capacity to perform his past relevant work by comparing his RFC to a security guard position's physical and mental demands. In rendering this determination, he referred to the DOT identification number for this position, Frost's Work History Report, and the VE testimony. (Tr. 16-17). Therefore, the court finds substantial evidence supports the ALJ's determination Frost can perform his past relevant work.

## B. The ALJ Properly Did Not Use the Medical-Vocational Guidelines

Frost next alleges the ALJ erred in failing to apply the Medical-Vocational Guidelines ("the grids") to determine his disability. Frost submits that as a 63-year-old

individual with a limited education[5], previous work experience that involves no transferable skills[6], and an ability to only perform sedentary or light work, the grids direct a ruling of disabled and entitle Frost to benefits. *See* 20 C.F.R. Part 404, Subpt. P, Appendix 2, Table No. 2, Rule 202.02. The Commissioner provides no response to Frost's argument in her brief. Nevertheless, the court finds Frost's argument lacks merit and the ALJ properly did not utilize the grids.

At the fourth step, the ALJ considers the assessment of the claimant's residual functional capacity and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ finds claimant can still perform his past relevant work, claimant receives a decision of "not disabled." *Id.* Once the ALJ renders such a determination, the ALJ need not proceed to the next step. *Id.* at § 404.1520(a)(4). Thus, the ALJ employs the grids at step five, when a claimant cannot perform past relevant work. *See* 20 C.F.R. § 404.1569 (stating that grids apply in "cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work").

Frost's claim lacks merit because substantial evidence supports the ALJ's determination Frost could perform his past relevant work as a security guard. (Tr. 73-77). At Frost's hearing, the VE testified that someone with Frost's limitations could

---

[5] Frost testified at the hearing that he only attended formal schooling through the seventh grade. (Tr. 52-53).

[6] The vocational expert testified that none of Frost's skills acquired through his security job are transferable to any other occupation at either the sedentary or light level. (Tr. 77)

perform his past work as a security guard. (Tr. 76). As previously held, Frost failed to demonstrate that he cannot perform his past relevant work. Therefore, the ALJ was not required to utilize the grids and properly concluded his analysis at step four of the sequential evaluation process.

### C. The ALJ Assigned Proper Weight to the Treating Physician's Opinion

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.* An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions. *Id.* An ALJ does not commit reversible error when (1) he articulates specific reasons for declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (*per curiam*).

Frost contends the ALJ erred in giving partial weight to the opinion of her treating physician, Dr. Anthony Lessa. After examining Frost in February 2015, Dr. Lessa completed a Treating Source Statement. (Tr. 411-15). Dr. Lessa opined that Frost's pain: (1) negatively affects adequate performance of daily activities or work; (2) greatly increases with physical activity to such a degree as to cause distraction from

tasks or total abandonment of such tasks; (3) would cause absences of more than four workdays a month; and (4) would not lessen with medication due to expected drug side effects of distraction, inattention, drowsiness. (Tr. 411). Dr. Lessa further opined that Frost's medical condition would reasonably be expected to produce the pain complained of, and that Frost has experienced this pain since his alleged onset date. (Tr. 412).

Moreover, Dr. Lessa stated that Frost suffers from thoracolumbar scoliosis with compensatory levoscoliosis, and additionally suffers from lumbar facet arthropathy from L3-L4 through LT-5. (Tr. 412). Dr. Lessa also noted Frost's bulging at T8-T9 in the thoracic spine with moderate to severe scoliosis and kyphosis.[7] (*Id.*) In the statement, Dr. Lessa opined that Frost's fatigue and weakness: (1) remained present to such an extent as to negatively affect adequate performance of daily activities or work; (2) greatly increases with physical activity to such a degree as to cause total abandonment of such tasks; (3) would not lessen with medication due to expected drug side effects of distraction, inattention, drowsiness, etc; and (4) stems from an underlying medical condition that can reasonably be expected to produce fatigue and weakness that he experiences. (Tr. 413).

---

[7] Kyphosis is defined as "the extreme curvature of the upper back also known as a hunchback." https://medical-dictionary.thefreedictionary.com/kyphosis (last visited Mar. 22, 2019).

Dr. Lessa's Treating Source Statement also included a Functional Assessment (Physical). (Tr. 414). Dr. Lessa concluded Frost: (1) could stand, walk, and sit for no more than one to two hours at a time; (2) required a sit/stand option; (3) needs to lie down three times a day for half an hour to an hour each time; (4) could lift and carry occasionally; (5) could perform a variety of exertional and non-exertional tasks occasionally; (6) could occasionally work in extreme heat, extreme cold, and wetness/humidity; (7) could never work among vibrations, amidst exposure to fumes and other noxious odors and dusts, in proximity to moving mechanical parts, or in high and exposed places; and (8) could work in a quiet environment only. (Tr. 414-15). The ALJ found Dr. Lessa's opinion lacking in explanation or supporting medical evidence, and therefore assigned it partial weight.

The court finds the ALJ possessed good cause to give partial weight to Dr. Lessa's opinion for several reasons. Evidence in the record only somewhat supports Dr. Lessa's opinion, including his own treatment notes. In July 2011, Frost underwent an MRI at Primary Care & Pain Management LLC, and the findings included likely lumbar radiculopathy[8], thoracolumbar scoliosis with compensatory mild levoscoliosis in the lumbar spine. (Tr. 256). The MRI exhibited no evidence of significant carnal

---

[8] Lumbar radiculopathy is defined as "compression and irritation of nerve roots in the lumbar region, with resultant pain in the lower back and lower limbs." https://medical-dictionary.thefreedictionary.com/Lumbar+radiculopathy (last visited Mar. 22, 2019)

lateral recess or foraminal stenosis on the lumbar spine, yet it displayed lower lumbar facet arthropathy from L3-L4 through L5-S1. (*Id.*)

Frost visited Urgent Care Northwest in August 2011 with complaints of nausea and indigestion and exhibited normal physical findings upon examination. (Tr. 388). He underwent an x-ray at this appointment, which displayed signs of scoliosis, and medical personnel prescribed him medication. (Tr. 394). Frost returned in September 2011, complaining of constant deep pain in his back and right hip, yet he stated both medication and rest help the pain. (Tr. 265-66). His physical exam produced normal findings, and personnel recommended continuing medication. (Tr. 266). At his monthly appointments between September and December 2011, his pain ranged between a 5 and 7 out of 10 in his lower leg, right shoulder, lower back, and hip, yet he stated that medication and rest help while work worsens the pain. (Tr. 253-64).

During his monthly visits at Urgent Care Northwest between February and April 2012, Frost's pain continued to range between a 5 and 8 out of 10, and he maintained a normal gait and posture while ambulating without assistance. (Tr. 234, 240, 246). Upon physical examination, medical personnel identified paralumbar and sacroiliac tenderness and spasms in RT+1 and LT+1. (Tr. 241). Frost consistently expressed satisfaction with his pain control on current medication (Tr. 242, 248) and stated that he enjoyed spending time with loved ones and fixing cars. (Tr. 238, 244, 250).

In June 2012, Frost visited Dr. Ralph Lyerly, Jr. at Walker Baptist Health System with complaints of nausea and vomiting. (Tr. 441). His physical examination displayed normal findings, and Dr. Lyerly diagnosed Frost with epigastric pain, recurring nausea, and vomiting, without abdominal tenderness. (Tr. 442). Dr. Lyerly also opined on the possibility of peptic ulcer disease or upper-GI neoplasia. (*Id.*) Frost underwent a duodenoscopy in August 2012, and findings indicated mild duodenitis. (Tr. 437).

According to Frost's medical records, he began visiting Dr. Lessa for monthly appointments in January 2013.[9] He complained of lower back pain radiating down into his right hip. (Tr. 282). Dr. Lessa diagnosed Frost with hip pain with radiculopathy and prescribed medication. (Tr. 283). Frost returned in February with complaints of hip pain with radiculopathy, and Dr. Lessa confirmed Frost's diagnosis of scoliosis. (Tr. 289).

In February 2013, Frost also visited Dr. Matthew Knight for a physical exam and complained of gallstones and abdominal pain in the right upper quad that had worsened over the previous two months. (Tr. 435). Dr. Knight ordered a laparoscopic cholecystectomy for Frost and identified gallbladder polyps and dyskinesia. (Tr. 436). Otherwise, Frost exhibited normal physical findings. (Tr. 432, 436).

---

[9] As the ALJ noted in his opinion, Dr. Lessa's treatment notes are difficult to read. However, the court finds that the ALJ gleaned enough information from the records to justify his decision, and the court will analyze Dr. Lessa's records in the same manner.

Between March and December 2013, Frost visited Dr. Lessa on a monthly basis. (Tr. 293-324). Frost regularly complained of pain related to his scoliosis and hip pain with radiculopathy (Tr. 293, 297, 301, 305, 309, 313, 315, 317, 319, 321, 323). Dr. Lessa continued Frost on his medication. (*Id.*) Beginning in July 2013, Dr. Lessa added a new diagnosis of lumbago to Frost's diagnosis codes. (Tr. 310, 314, 316, 318, 320, 322, 324). In August 2013, Frost reported an increase in pain with extra work he was performing over the summer. (Tr. 315). In December 2013, Dr. Lessa added a diagnosis of lumbar degenerative disc disease to Frost's diagnosis codes. (Tr. 324).

In January 2014, Frost returned to Dr. Lessa with complaints of pain related to his lumbar scoliosis. (Tr. 369). Dr. Lessa diagnosed Frost with lumbar degenerative disk disease and lumbago. (Tr. 370). During his February 2014 appointment with Dr. Lessa, Frost informed him that he returned to work and struggled with recurring hiccups and nausea. (Tr. 367). Dr. Lessa noted that Frost remained on medication for blood pressure and continued Frost on his normal medication regimen. (Tr. 367). In March 2014, Frost visited Dr. Lessa with complaints of bloating, gas, hiccups that occurred for long periods of time twice a week, and gastrointestinal issues. (Tr. 328). Frost returned later in the month, reporting that although he was staying active and working outside, he struggled with hiccups. (Tr. 366). In April 2014, Frost reported to Dr. Lessa that he regularly worked eight to ten hours a day, and Dr. Lessa maintained his assessment of Frost's diagnoses of lumbago and lumbar degenerative disc disease. (Tr. 363-64).

Frost visited Dr. Clifford Black in May 2014 for a reflux evaluation, complaining of hiccups associated with nausea, vomiting, diarrhea, heart burn, and regurgitation. (Tr. 347). Frost attributed relief for his symptoms, with the exception of the hiccups, to medication. (*Id.*) Two weeks later, the findings demonstrated a medically refractory G-reflux disease and moderate dysmotility with spontaneous reflux throughout the exam. (Tr. 406). Frost also returned to Dr. Lessa in May 2014, reporting increased activity with the warmer weather and compliance with his medication. (Tr. 361).

In June 2014, Frost visited Capstone Rural Health Center for a follow-up appointment regarding his hernia surgery, and he reported no complications. (Tr. 327). Frost appeared well-developed and was in no acute distress, and he exhibited normal findings during his physical exam. (*Id.*) Medical personnel diagnosed Frost with benign essential hypertension, chronic reflux esophagitis, and Type II-B hyperlipoproteinemia. (Tr. 328).

Between June and August 2014, Frost visited Dr. Lessa monthly and reported continued compliance with medication for his lumbar degenerative disc disease, hypertension, and lumbago. (Tr. 356, 357, 359). During his September and October 2014 appointments with Dr. Lessa, Frost reported that he remained active with his lawn mowing service, though he still experienced pain related to scoliosis, lumbago, and lumbar degenerative disc disease. (Tr. 351-354).

Frost reported to Anniston General Surgery in November 2014 for an evaluation for his reflux and hiccups. (Tr. 398). Frost underwent a barium swallow study, revealing spontaneous reflux and esophageal dysmotility.[10] (*Id.*) During his physical exam, personnel identified Frost's yellowing eyes, but Frost displayed otherwise normal findings of a supple neck, no heart murmurs, soft and nontender abdomen, and no edema. (Tr. 399). Based on his symptoms, medical personnel diagnosed Frost with GERD and scheduled him for surgery in January 2015. (Tr. 399).

In December 2014, Frost underwent a lower spine x-ray, demonstrating mild scoliosis, lumbar lordosis, and mild degenerative spurring throughout the lumbar spine. (Tr. 381). The findings showed no focal or acute bony abnormalities, as well as a well-maintained vertebral body height and disc interspaces. (*Id.*)

In December 2014, Dr. Celtic Robertson conducted a physical examination of Frost. (Tr. 383). Frost rated his back pain between a 7 and 8 out of 10, and Dr. Robertson noted Frost's visible scoliosis posteriorly while sitting down. (*Id.*) Frost demonstrated a regular heart rate and rhythm; no edema; a supple neck without adenopathy, thyromegaly, or masses; no cyanosis, clubbing, or edema in the extremities; normal gait; an ability to toe/heel walk; and ability to squat and rise,

_____

[10] Dysmotility is defined as "[a]ny abnormality of smooth muscle function in the gastrointestinal tract, such as gastroparesis, gastric atony, intestinal pseudo-obstruction, or biliary dyskinesia." https://medical-dictionary.thefreedictionary.com/dysmotility (last visited Mar. 22, 2019).

though the movement exacerbated his back pain. (Tr. 383-84). Dr. Robertson measured the range of motion of Frost's extremities and diagnosed Frost with scoliosis and lumbar facet arthropathy. (Tr. 384-85).

Dr. Robertson opined that Frost had no limitations in standing, walking, or sitting, and could lift no more than fifty (50) pounds due to his difficulties with forward flexion and squatting. (Tr. 385). Regarding Frost's postural activities, Dr. Robertson further opined that Frost can: (1) occasionally stoop, limited by difficulty with forward flexion; (2) occasionally crouch, limited by difficulty with squatting; and (3) never climb ladders due to increased risk of injury as a result of decreased reaction time. (Tr. 386). Regarding Frost's workplace environmental activities, Dr. Robertson identified no limitations, except for unprotected heights due to increased risk of injury as a result of decreased reaction time. (*Id.*) The ALJ accorded great weight to Dr. Robertson's opinion. (Tr. 16).

At the end of December 2014, Frost visited Dr. Lessa, informing him that he was working on old cars yet struggled with acid reflux. (Tr. 483). In January 2015, Frost underwent a portable chest x-ray at Stringfellow Memorial Hospital, exhibiting normal findings for his heart. (Tr. 407). The same day, he underwent a lap toupet, and Frost later reported no complications and a disappearance of his symptoms of regurge, bad taste in his mouth, and burning. (Tr. 401, 408). Frost continued to struggle with hiccups. (Tr. 401).

In January 2015, Dr. James Sims completed a Disability Determination Explanation for Frost, basing his analysis on a review of Frost's medical records. Dr. Sims opined that Frost's medically determinable impairments consisted of degenerative disc disease, curvature of the spine, spine disorders, other disorders of the gastrointestinal system, and hernias. (Tr. 89). Dr. Sims further opined that Frost's impairments limited him to medium exertional work with mild postural limits, including a prohibition against utilizing ropes, ladders, or scaffolds due to risk of injury. (Tr. 90-91).

Frost visited Capstone Rural Health Center in March 2015 with a complaint of recurring hiccups over the past four years. (Tr. 417). Frost's physical exam demonstrated normal ENT findings, a normal respiration rhythm, no abdominal abnormalities, and a normal general appearance. (*Id.*) Medical personnel assessed Frost with anxiety and hiccups, and prescribed medication. (Tr. 418).

During his April and May 2015 appointments with Dr. Lessa, Frost complained of pain related to his lumbar radiculopathy and GERD. (Tr. 473, 475). Dr. Lessa's assessments of Frost's impairments included thoracic scoliosis, lumbar degenerative disc disease, and lumbago. (Tr. 473-476).

In June 2015, Frost visited Dr. Eugene Lai for an appointment regarding possible hyperlipidemia. (Tr. 445). Frost complained of lower back pain and reported no problems from his medication. (*Id.*) Furthermore, he displayed normal results

during his physical exam, and Dr. Lai recommended medicine and dietary changes. (Tr. 446).

In June 2015, Frost underwent an upper endoscopy and colonoscopy at Walker Baptist Medical Center. (Tr. 424). Medical personnel identified the presence of gastritis duodenitis, gastroparesis reflux, hiatal hernia, hemorrhoids, and internal and external colon polyps. (*Id.*) Medical personnel recommended dietary changes and medicine for Frost's diagnoses. (Tr. 426). During his August 2015 appointment with Dr. Lessa, Frost reviewed the colonoscopy results with him. (Tr. 467). Frost continued struggling with hiccups and high blood pressure, and Dr. Lessa kept him on medication. (*Id.*)

Frost returned to Dr. Tai in September 2015 for a follow-up appointment on his chronic back pain, hypertension, and hyperlipidemia. (Tr. 448). Frost exhibited normal findings during his physical exam, and Dr. Tai diagnosed Frost with diabetes mellitus. (Tr. 448-49).

From October 2015 through February 2016, Frost complained of chronic hiccups and reflux during his monthly appointments with Dr. Lessa. (Tr. 455, 457, 459, 461, and 463). In November 2015, Frost reported that he was still working on cars. (Tr. 461). In February 2016, Frost reported an improved quality of life with changes in his nutrition and activity. (Tr. 455).

Based on this review, the ALJ properly articulated that Dr. Lessa's opinion enforced strict limits on Frost's ability to work that were not consistent with or

supported by Frost's treatment records, and thus substantial evidence buttresses the ALJ's accordance of partial weight to Dr. Lessa's opinion regarding Frost's alleged disability.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

**DONE** this 27th day of March, 2019.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE